Our first case up this afternoon is 424-1282, Illinois Baptist State Association v. Illinois Department of Insurance. For the appellant, Matt Bells. Thank you Mr. Bells. For the appellant, Anna Gottlieb. Thank you. Mr. Bells, on behalf of the appellant, you may proceed sir. There is no basis in law or in logic for the state to force a small non-profit Baptist organization, 30 employees, to provide abortion coverage to its employees. Yet this is what has happened since 2020 when the state passed the RHA, Reproductive Health Act. Thankfully, Illinois' broad religious liberty protections laid out in the Religious Freedom Restoration Act bars the state's activity. IDSA, previously for decades, had a health plan that excluded abortion coverage, consistent with its beliefs. This was the standard in Illinois. But as a direct result of the RHA, IDSA's health insurer in 2018 added abortion coverage in 2019. 2019 to 2020 they added, and so did all other insurance plans regulated by the state of Illinois. This means that IDSA has provided abortion coverage against its sincerely held beliefs for years now for its employees and their family members. The central issue is this. The state essentially says, IDSA, there's loopholes to our laws. There's exceptions that we can't deal with. And you need to exploit those laws. Exploit those loopholes. There are some alternatives such as self-insurance that come up. Even the state doesn't push this for IDSA. Self-insurance could be catastrophic if there's a bad injury. And it's generally withheld, reserved for employers with 250 plus employees. The department and the district court that wrongly granted summary judgment to the department have determined that there is really a single sufficient alternative. A Texas-based insurance company called Guidestone. Guidestone is a Baptist organization. They don't provide abortion coverage. And because they're this multi-state plan with, I guess, a nationwide network, they can't be governed by the state of Illinois. So they evade the RHA. There's numerous problems with just saying, hey, Guidestone's your answer. The history has been rocky, to say the least. Well, why only Guidestone? Aren't there any other insurance programs that you can seek to get coverage from? Certainly not Illinois-based. If you're talking about the category of multi-state insurers, which I guess is where Guidestone falls, my client's broker, who's based in Illinois, said the initial problem is he can't sell out-of-state plans. So you've got an access problem. Where's my client going to go to actually find a plan? Guidestone is a Southern Baptist organization, so they've got a history. Have they tried other brokers other than this particular broker? I don't know that they've looked for out-of-state brokers. I'm not sure how they would go about that. Have they looked at any other Illinois brokers that might also be able to sell out-of-state insurance? My understanding is that an Illinois broker cannot sell out-of-state plans because their license is only for Illinois plans. But you can get coverage from an insurance company that sells in Illinois that isn't based in Illinois, could you not? You can get a multi-state plan that has a nationwide network. My understanding is those are generally reserved, not reserved, but the purpose of those is to cover employees who may spend some time in one state, spend some time in another, and they need a nationwide network. And that costs money to have in-network providers in multiple places. So you might be able to have this available for some other company, but you think it might cost much more? It costs more and it's simply hard to get to. Don't you have to establish on this record these unknowns that we just asked you about? Namely, that insurance coverage has been pursued nationwide. Certainly someone should be in this business to be able to check it out. How much more it would cost so that you can't afford it and you shouldn't be required to afford it. But we don't know any of that now, do we? Isn't this just speculation? The record with Guy Stone says it hasn't gone well. And there is evidence in the record that my client's broker said he had explored out-of-state plans and they were going to be cost prohibitive. That's in our brief. I don't have the record citation, but it is in there. So it is in the record. Isn't this also a matter of legislative history? That is what the Illinois General Assembly intend when they came up with the RHA. What does that stand for again? Read the Book for Health Act? Yes, sir. Okay. And you, if I understand correctly, in your brief, page five, you cite four debates where member of the House of Representatives, member of the Senate spoke in favor of it, and they were talking about its effect on perhaps businesses like yours. And, excuse me, you write in your brief, after quoting this language, the Illinois General Assembly thus anticipated the plaintiff's claim, is it assured the public that these rights would be protected? That's based upon the remarks of legislators during the legislative process, isn't that? Yes. Why should we pay any attention to those remarks? That is, if the Illinois General Assembly anticipated your claims and wanted to make sure your rights would be protected, how about putting that language in the bill? Well, they assured the public that it was in the bill. I don't think it was. Well, that's my point. Your arguing legislative intent, you have a lot of experience in this court with those questions, and I personally, having worked for the legislature back many years ago, I'm wondering if there's a serious issue about a proposal like this, and you're concerned about having some protection, how about someone putting that language that you quoted that they were speaking about in the bill itself, so we don't have to guess as to whether or not any other representatives agreed? What I would say is, part of what I think they were saying was, I think part of the legislators, those two legislators, I think partly they were incorrect. They wanted this law to pass, and they pointed to the Health Care Right of Conscious Act, which protects doctors and pharmacists and things like that, and I think they were saying, I think maybe what they were saying is, the law already protects religious employers who buy health care. We had a Health Care Right of Conscious Act as our count two in the lower court. It was dismissed because the court found that an employer wasn't a health care payer. We did not appeal that. I think the claim was a little bit putting a square peg in a round hole. Is there any language to the effect of the protection you're now seeking ever introduced by any legislator during the legislative process? I don't know. I don't have the full quote in front of me. They cited an amendment that says, now protects religious employers. They said something like, we've made it very clear. It's in the long block quote that I put in. I don't have that. Following up on Justice Steigman's question, though, I guess as we evaluate your briefs, it doesn't appear to me that you've argued that the plain language, that the department is not following the plain language of the law, or that the language itself of the provision is ambiguous. So how do we get to the point that we're considering the references you've made to what the senator said during the debate? What I would say is this. My sort of bad argument is I'd like to see the state legislators help with their word. My better argument is, I think the state, the people who are trying to pass this law that found this so important, we're acknowledging the burden. We've got to prove a religious burden in this case, a substantial burden. These two legislators are saying, we hear you, religious employers, and we are going to protect you. We acknowledge the burden, and we are assuring you that you are going to be opting out of this law. So it's more evidence that the state is acknowledging that there's a burden in this case, a religious burden. The following up on, excuse me, following up on the question Justice Landreth asked, you quoting Representative Cassidy's remarks about what this statute was going to be, what this bill would expect, was that on third reading? I suspect so. Do you know? I do not have the transcript. I'm not sure, Your Honor. But here's the question I have in dealing with this kind of an issue. Let's assume Representative Burful didn't agree with Representative Cassidy's remarks about what the bill would be on. That is, her remarks are her interpretation of the bill, not language actually in the bill. Would it be incumbent upon Representative Burful to stand up at third reading and say, by the way, I disagree with those remarks, and I want to make sure that somehow those statements do not reflect the intention of everybody, certainly not mine, about what this bill would do and its effect? Is he required to do that? And in the absence of doing that, would Representative Cassidy's remarks then constitute legislative intent? I think if I understand your question, I would have liked for everyone in the room to have fully understood the bill and to have made sure that what these sponsors were saying was correct about whether these protections were in the law. That obviously didn't happen somewhere along the line. Well, it's a rhetorical question because, actually, I think the clear answer is no, it's not required to do anything. And I don't think there's any case law that holds, and certainly that's not the procedure, but if you're sitting in the House of Representatives and someone gets up on third reading and says what the bill means, that somehow that's binding upon you in the absence of your getting up and saying otherwise. The other thing is, of course, we have a bicameral legislature. So Representative Cassidy got up and said this in the Illinois House, let's assume it passes on third reading, and goes over to the Senate. Would anyone at the Senate know or care what she said in the House on third reading? Right. It's my understanding that both sides of the General Assembly made the same statement, a prepared statement, but I'll take that. I can't say that what these two sponsors said was binding on the court. I'm not going to say that. I do think it has a weight. No, binding on other legislators, so that if they don't stand up and speak, this is now the accepted legislative intent. I just don't think that's the case. The reason I mention this is you make a big argument about how we should look to legislative intent on the remarks of these legislators. I don't know that that's a legitimate thing to do. I don't know if it's legislative intent. I'm considering it an admission, an acknowledgment that there is a burden. That's what we need to prove, and the very people who sponsored this law admitted it. If I could ask just a couple of points of clarification with regards to the brief. The association has asserted its religious belief that it should provide insurance for its employees. I just want to follow up, though, to make sure. Is there any state or federal statute requiring IBSA to provide employees with health insurance? My understanding is that I think it's a federal law. I don't know. No, I don't think so. I don't know what the threshold is. Because their employee numbers are at 250 employees. I don't know what it is. So it's beneath that threshold. I think that's correct. Okay. And then if the IBSA does not provide health insurance to its employees, are they subject to any fee, tax, fine, or other penalty from any federal or state government as a direct result of not providing that insurance? I don't believe so. I don't totally remember this. I've worked on cases that involve it. Like I said, I think if you're under a certain threshold. I don't know if it's 50 employees. I can't remember what it is. I believe they're under. And I don't believe they're subject to any penalty. I don't believe so. And then finally, with regards to the arguments in your brief, are you arguing that the abortion coverage mandate is not being mutually applied? No. To me, that's a question under a free exercise clause claim. And you're not raising it? And we're not making a free exercise clause claim. I think Illinois' RFRA law allows us to avoid that whole mess altogether. Okay. And so I just wanted to clarify that because it did appear to me that several of the cases that you've cited did seem to be more along the lines of the constitutional claims. Right. And our position, and this is something I disagree with my opposing counsel on, is that a free exercise claim, there have been successful free exercise clause claims on the West Coast. The Skyline case, the Foothills Church case, basically the same type of facts. And those are free exercise claims. It's our position that a free exercise claim is the same as our case but harder. I mean, they've got to prove a substantial burden, but they've got to go a level over that. And if the law is neutral and of general applicability under Smith, then that law can still survive. RFRA takes those barriers away from us. So it's, you know, basically there are some cases where people in our position have prevailed even though they had a harder workload. Those Skyline cases, they involved the same thing where they could have gotten out-of-state plans. They could have self-insured. So obviously those aren't binding on this court, but they're the closest we've got and they're very helpful to me. You discussed Guidestone a few moments ago, and it was indicated that at one point that Guidestone would not give a quote to IVSA at one point because I think in essence they felt it would be too costly and so not appropriate. However, did the association or anyone on their behalf seek out other out-of-state insurance policies that would not have been subject to the mandate? The only thing I know from the record is that they had a conversation with their broker and the broker said out-of-state plans would be cost prohibitive. That's in our appellant's brief. I don't have the site in front of us, but I could find it. And so they've explored it through asking their broker, which I think is fair to ask an expert. If possible, I would appreciate that site. You obviously may continue with your argument at this point. Counsel, if I can just kind of follow up on that a little bit. So it seems to me that the association prioritized saving money and it hasn't been mentioned here today, but it's in the briefs also making sure the employees have access to the local hospital over avoiding having to pay for abortions. On the cost issue, in 2018 they were told that Guidestone was going to be $200,000 more or hundreds of thousands of dollars more is what the testimony said. I can't say what it would be if it was close. But that's an amount that was just impossible for them to deal with. The Springfield Clinic, in the most recent year where they were almost going to go with Guidestone, there was a problem where they found out at the last second that the Springfield Clinic was not going to be covered. And 60% of their employees get health care from the Springfield Clinic. And they had priorities and they had to make a decision. They were basically just not willing to tell their employees they all had to find new doctors. So does that answer your question? It does. Following up with that, I guess though as we evaluate that situation with the Springfield Clinic that allegedly is now resolved, but even at the time, how can any negative effects or potential burdens to the association caused by that change in the business structure really be the fault, if you will, of the state or the Department of Insurance as it relates to the coverage mandate? Well, the fault is they used to have more options. I mean, they used to be able to go to UnitedHealthcare of Illinois. They used to be able to go to Health Alliance. They used to be able to go to Blue Cross Blue Shield. These were all, if you look at a plan from 2018, they all excluded abortion. They used to have a full marketplace of options where they could get the plan that they wanted. Now we're saying, hey, you've got one option. It's Guidestone. I mean, this is the only one anybody ever put forward. It's the only one that they know of. And that's all they have. So the market has been reduced to one if they're going to act within there. Counsel, you argue, if I understand correctly, that the department's abandonment of the legislature's intent is unacceptable from a legal perspective and a general governance standard, the state should be held to its word. What word is that? The two sponsors in the legislature are saying, we will protect you, religious employers. We hear your questions, and we will protect you. That's what I was referring to. Okay. If that was up, you'll have an opportunity to address this in your model. Ms. Gottlieb, on behalf of the FLE, you may proceed. Good afternoon. May it please the Court. Counsel. I'm Assistant Attorney General Anna Gottlieb, and I represent the Illinois Department of Insurance. This appeal presents a narrow issue for this Court. Whether the Illinois Baptist State Association can demonstrate a substantial burden under the Illinois Religious Freedom and Restoration Act. To show a substantial burden, a party must prove that the challenged government regulation presents a coercive choice of either abandoning one's religious beliefs or of not complying with the government regulation. The association cannot make that showing, and this quorum should affirm on that basis alone, and the Court could and should affirm on that basis alone. The circuit court correctly granted summary judgment to the department. Section 4A of the insurance code does not regulate the association, and it does not require the association to purchase any particular insurance plan. Rather, Section 4A only states that insurance plans regulated by the department must provide coverage for abortion care. Thus, the association, like any employer in Illinois, has a range of options when choosing a plan for its employees. Counsel, this is a question more along the way of background, but before you get into anything further, how does the department determine what constitutes an in-state insurance policy and an out-of-state policy as to which it regulates? Sure, Your Honor. We covered this in our brief. There are certain, basically the department regulates transactions that occur in the state, but there are, so products sold in the state of Illinois, but there are certain exemptions, for instance, for federal government products, as well as for products that are governed by a different state. So as an example, in this case, Guidestone, because the Guidestone product is already regulated by the state of Texas, it qualifies for an exemption under the Illinois insurance code, and in that case the department does not regulate that product. Employers can opt to purchase a product regulated by the department and one that would thus be subject to Section 4A, but they can also self-fund an insurance program. They can offer a level-funded program that's also not subject to this regulation, and they can offer products regulated by the federal government, as well as products from other states. In this case, the record demonstrates that the association had the option to choose an insurance plan that did not provide coverage for abortion care, but it nevertheless chose a different plan. For that reason, any... How do we know what those options were? What does the record show? So the record shows that, and I'd like to just take a step back and work here on the RFRA claim in which the association does bear the burden of showing it bears a substantial burden. So on this record, we know about the Guidestone plan that the association was offered and it received a quote for, which was actually lower than the plan that they ultimately ended up going with. So it certainly had that plan available to it. And also the other plan... Well, I'm not sure I understand. I thought Mr. Bell said that the Guidestone plan would be more expensive. The record actually reflects that the Guidestone plan was $6,000 cheaper for the association annually. That is on page 330 of the record. Why didn't the association sign up? So the record shows that two of the decision makers at the association had a conversation about between these two plans. They were choosing between the Health Alliance plan and the Guidestone plan, and ultimately they made a business decision. They ultimately opted for the Health Alliance plan, which was regulated by the Illinois Department of Insurance, because at the time that plan had the Springfield Clinic as an in-network provider, and at the time they believed that that was the best choice for their employees. But a few notes about the Springfield Clinic. First, the record does show that by the close of discovery, one of the association witnesses testified that he believed Springfield Clinic had resolved its issue with the Blue Cross Blue Shield network, and was therefore again in-network. We also cited some articles to that effect in our summary judgment papers, of which the court may take judicial notice. And even if there was some dispute about whether the Springfield Clinic was in-network or out-of-network, that's actually irrelevant to the substantial burden inquiry here. The association does not and cannot show on this record that they incurred any additional burden because the Springfield Clinic may have been out-of-network for some of its employees. For instance, it hasn't shown that there were no other providers in the area, that these other providers were providing lesser care, or that their employees would suffer in any way, and none of those burdens would be attributable to the association, who is the plaintiff here. As counsel has suggested, and he suggests that there was a larger, more extensive search to out-of-state networks perhaps, then the record reflects, or at least he's going to provide me with that site. But let's, for hypothetical purposes, say that the only one they checked with out-of-state was Guidestone. Or if there was no policy available, then would that constitute a substantial burden under the Religious Freedom Restoration Act? So first I'd like to just clarify a couple notes about the record. On pages E-108 and 109, Mr. Samuelson, who was the Illinois-based insurance broker, testified that he didn't look into self-insurance. And I believe he also testified he did not look into out-of-state options because he himself was not able to sell those products. The association on this record could not show that they made these additional inquiries. But to answer your question, even if there isn't anything in the record that specifically would show whether a search was undertaken, I mean, all we have is speculation at this point. The department came forward with options that are not regulated by the department. We have self-funding. We have federal-funded products. We also have products from the government, from the federal government. So it is the association's burden to come forward with evidence that these are either cost-prohibitive or somehow otherwise would burden the association. They have not done so. Counsel, I asked Mr. Bells about the remarks that he cites in his brief of these legislators, which he said supports his position. Were those remarks delivered on third reading? I actually do not know the answer to that, Your Honor. You heard the questions I asked him about whether or not other legislators might be who disagree with these remarks would be under compulsion to respond or to somehow, by their silence, acknowledge and accept the explanations given by Representative Cassidy for one quote. What's the position of the Attorney General's Office regarding remarks by legislators? Let's assume it's third reading. I think it probably would be. I don't think the others are recorded. As revealing or constituting legislative intent on what the act under consideration, the proposed bill under consideration then would mean, what its effect would be. Well, Your Honor, from a statutory interpretation perspective, those statements here would be irrelevant because there's no question in this case about whether Section 4A is ambiguous. I think you may be right, but that's not my question. My question was, what's your position regarding the merit of claiming that we could consider legislative intent based upon the remarks of individual legislators made during third reading? Well, Your Honor, I think that's when considering outside sources other than plain language, which, again, we're not doing in this case. We're not even interpreting Section 4A. This is a RFRA claim. But if a case was before this court where the court was tasked with interpreting a statute and the language was ambiguous, it could look to other indicators of legislative intent, such as remarks made. But that said, as Your Honor indicated, those are by no means binding on the whole legislature. Well, if they're not binding, then how are they primitive of the issue, right? If they're not speaking for anyone else, in what sense do they constitute the expression of legislative intent? I think that in a case involving statutory interpretation, you would look to various indicators, and that would be one of them, and it would be for the court to decide how strong those indicators are. But I don't want to answer that question in a vacuum. With the case we have before us here, I would just like to note that the Association never made a claim below or made an argument below that the comments made by the legislators are somehow part of the statute now. There's no dispute that there's no exemption in Section 4A. And with regard to the Health Care Right of Conscience Act, as Mr. Bell has pointed out, the Association had brought a claim earlier in this litigation and has since abandoned it. So that's not at issue before this court at all. Just returning briefly to the substantial burden inquiry, under this court's case law, the Illinois RFRA statute requires a plaintiff to show that a government in action would prevent a plaintiff from engaging in conduct or from having the religious experience that his faith mandates. That burden cannot be satisfied here because of the alternative that was present and that alternative that was not chosen. And federal cases on this point, too, have instructed that a substantial burden cannot be met where a plaintiff simply suggests that they do not have their preferred option available to them. Mr. Bell has suggested that the Association no longer has access to the whole market, the whole insurance market. The RFRA claim is not here to ensure that an individual or an entity with religious objections has the same access it would without those objections. A RFRA claim is to ensure that a government regulation does not substantially burden an individual's ability to practice their faith, and that could mean one alternative that is feasible and accessible, as this record suggests. Counsel, is there ever a level of cost, say, to the Association or a barrier to having the care providers that they prefer? Is that ever enough to satisfy the substantial burden? I mean, can it get to a level where that would be met? Hypothetically, and I'd like to, again, point out that the claim here is brought by the Association, not by the employees. So even if the employees are, you know, perhaps needing to change providers because something is in or out of network, that is not really a burden on the Association itself. So I guess, hypothetically, maybe if this Association or a plaintiff came forward with evidence that their employees were leaving because a different benefit was offered, that could potentially be tied into the substantial burden inquiry, but I'd like to clarify that none of this type of evidence is present in this record. There's no evidence other than merely saying that the Springfield Clinic might be out of network. There is no evidence that suggests that either the employees or the Association suffered any kind of burden as a result. My understanding is that Springfield has multiple other providers available and that other providers were available through the Guidestone insurance plan. And very briefly, in the alternative, this court should also find that the challenge provision separately does not violate RFRA because it furthers a compelling governmental interest in ensuring equitable access to abortion care, and this law is the least restrictive means of doing so. The state has a compelling interest in ensuring that patients have equitable and timely access to abortion care and that such care is treated as all other basic health services. The interest here is compelling because before the Reproductive Health Act, which added Section 4A to the insurance code, was enacted, there was a demonstrated gap in the ability of individuals with private insurance seeking and needing abortion care and their ability to secure timely funding. Section 4A now provides uniform coverage for individuals in this state, regardless of whether those individuals have private insurance or state-sponsored insurance, and as such, abortion care is treated like any other basic health care service enumerated in the state's insurance regulatory scheme. Section 4A is likewise the least restrictive means of achieving that interest. As evidenced here, while the law applies to all department-regulated products, it does not limit, or it does not apply to all plans available to employers in the state. Because of this... Counsel, if I may, couldn't the state allow for the religious accommodations like the Association has asked for and simply have the state reimburse medical providers for patients whose insurance does not include abortion care? Why wouldn't that be the most least restrictive means of accomplishing the state's goal? So I think those two proposals in your questionnaire, the first one being an exemption from the law, so that would not be less restrictive than the law here because the law already provides alternatives. Because the law does not provide anything more than insurance plans sold in the state of Illinois, there are alternatives for employers, for instance, as we mentioned, self-funding, level-funded products, out-of-state products, and federal government products. So the exemption in the law would not create alternative... would... is not the only way to create alternatives. Those alternatives already exist. And the second question about the state funding abortion care directly, that is also not a less restrictive means of achieving the compelling interest here. Setting aside the issue of administering a plan for individuals who already have a private insurance plan, which would be very burdensome and difficult to work, that would not further the compelling interest here of timely and equitable abortion access. The timeliness factor here is incredibly important in terms of an individual who may need abortion care has a limited period of time of doing so, so seeking out another insurance plan in that window would be... would frustrate the interest here. But again, this Court does not need to reach the question of the second inquiry under RFRA, because in this case the factual record is clear that the challenge law did not substantially harden the Association's ability to freely exercise its religious beliefs. If there are no further questions... I see none. Thank you, counsel. Mr. Belz, on behalf of the appellant, can you make your double argument at this time, sir? And Justice Lanard, the... at least what I was talking about is in page 30 of our brief, where we say after the abortion coverage mandate passed, IBSA inquired about out-of-state plans and IBSA was told that would have... that that would have required returning to a much more costly plan. And we cite two sections of the record which, frankly, I don't know what they are standing here. I think one of them might be a declaration and one of them is something else. But I certainly hope I cited the record accurately. Just a couple things. One thing is I think when my opposing counsel talks about this litany of many options where we can go to self-funding, level funding, federal government, none of them work except possibly the multi-state one from Guidestone. Self-funding, even the government in their brief or the department in their brief, they never say you guys should... you guys with 30 employees should look at this. So when you go through the options, it doesn't work. Level funding is just a version of self-funding that requires you to look at the health of your employees. Products from the federal government, I don't necessarily know what that means, but I do know that the circuit court talked about federally managed plans. I think that's like Medicare. There's a federal employee plan. They just don't apply. They don't work here. Another thing, it was mentioned that we abandoned our health care right of conscience act. We lost before the circuit court. We didn't appeal. It's my position on the health care right of conscience act that that is basically a religious freedom, essentially protects religious freedom. There may be other people who are not religious that have health care right of conscience claims, but essentially if a pharmacist doesn't want to get involved in a health care issue, RFRA would protect them too, maybe as much. So I don't think we need to have both. We took our best claim and moved forward with it. On the compelling interest issue, the one thing I just want to point out is the difference that we have in our briefs. When you look at a compelling interest, if we get the strict scrutiny, and I hope we do, Fulton versus City of Philadelphia and Hobby Lobby both require that the government say, prove that they can't provide an exception. They have a compelling reason not to provide an exception to the claimants. I just can't see any way that they can sit there and say, well, we just can't accept this 30-person Baptist organization from our law. Our law would fall apart. It just doesn't work. On the least restrictive means issue, I think Hobby Lobby really outlines the lesser restrictive means. In Hobby Lobby, the government, talking about a federal government plan, says, hey, federal government, just provide this stuff yourself. That was contraceptives. Just provide it yourself. You've already got plans. You've already got laws in place that give contraceptive access to people who need it. If the federal government can do it, Illinois can do it. But Hobby Lobby settled on this idea called the accommodation, where essentially you would just, the religious employer would say, we don't want to provide this, and then the insurer would provide it directly to the employees. That's essentially what we have. We're asking for narrow relief, just an exception for our clients, 30 employees plus dependents. This is not going to disturb the whole state of Illinois, and it would honor RFRA and our clients' religious beliefs. No other questions? Thank you for your time. Thank you, counsel. The court will thank you for that kind advisement. Be sure to see you in the new course, and we'll stand in recess.